COFFMAN INDUSTRIES, INC., Respondent,

v.

GORMAN–TABER CO., Respondent-Appellant,

v.

The FIDELITY AND CASUALTY COMPANY OF NEW YORK, Appellant-Respondent.

No. KCD 26205.

Missouri Court of Appeals, Kansas City District.

March 31, 1975.

John C. Dods, Gene E. Voigts, Kansas City, for respondent-appellant.

F. Philip Kirwan, Richard W. Mason, Jr., Kansas City, for appellant-respondent; Margolin & Kirwan, Kansas City, of counsel.

Before DIXON, C. J., and SHANGLER and WASSERSTROM, JJ.

SHANGLER, Judge.

This review is of cross-appeals taken by the defendant Fidelity and Casualty Company of New York and defendant-third party plaintiff Gorman-Taber Company.

The litigation was the culmination of this sequence of events: Beardsley Construction Company [Beardsley] became the general contractor for a sewage treatment plant. As a condition of the undertaking

Beardsley obtained from Fidelity and Casualty Company of New York [Fidelity] a performance bond to guarantee payment by the contractor and sub-contractor of all supplies, material and labor. Gorman-Taber Company [Gorman-Taber] was designated subcontractor on the project and found it necessary to purchase certain equipment from Coffman Industries, Inc. [Coffman] for $16,770. When the equipment was delivered some was damaged and unusable. Gorman-Taber paid $15,000 toward the invoice price and made a new order in the amount of $7,352 to replace the damaged equipment. A dispute arose between Gorman-Taber and Coffman as to who assumed the risk of loss during the first shipment. Coffman claimed it was owed the $7,352.

When the treatment plant was completed by Beardsley in December of 1967, the dispute between Gorman-Taber and Coffman had not yet been resolved. At that time, Beardsley owed Gorman-Taber $16,359.42 on the subcontract. In January of 1968, Beardsley notified Fidelity that it was unable to pay the outstanding obligations on the project. Beardsley also notified Fidelity of the dispute concerning the damaged equipment and that Coffman claimed $7,352 against Gorman-Taber.

The action we review commenced as a claim by Coffman for the contract price of the equipment sold to Gorman-Taber in which Beardsley and Fidelity were joined as codefendants. The Coffman claim was entitled through a compromise payment by Gorman-Taber and Trans-American Freight Lines, Inc., the shipper. Thereupon, with leave, Gorman-Taber filed a cross-claim in four counts against Beardsley and Fidelity which alleged

[Count I] a recovery for $16,964.65 from Beardsley for breach of contract

[Count II] recovery in like amount, for breach of contract and contractor's bond against Beardsley and Fidelity

[Count III] recovery in like amount against Fidelity on an account stated

[Count IV] recovery in like amount against Fidelity for breach of an independent oral contract.

In defense of the petition of Coffman and the cross-claim of Gorman-Taber, Fidelity set up the bar of § 60–1111 of the Kansas Statutes Annotated which requires an action upon a public improvement bond to be brought within six months of completion of the work. Gorman-Taber conceded its cross-claim was brought after the expiration of statutory limitations.

Judgment by default was entered against Beardsley on Count I. Counts II and III were dismissed upon motion at the close of the plaintiff's evidence. Count IV was submitted to the jury and a verdict of $16,359.-42 returned for plaintiff.

The theory of recovery submitted by Count IV was that by means of a separate oral contract Fidelity agreed to pay Gorman-Taber the balance due on the Beardsley contract once the Coffman claim against Gorman-Taber was settled. On this appeal, Fidelity contends that the alleged oral contract was invalid and unenforceable and that even if the evidence proved an offer of such performance, it was for a unilateral contract which Fidelity revoked before acceptance by Gorman-Taber. The cross-appeal of Gorman-Taber contends that Counts II and III were submissible and were improperly dismissed by the court.

The disposition of the pending appeals depends upon the legal effect to be given certain communications exchanged among the principals after it became apparent that Beardsley could not meet its obligations on the contract. We view the evidence in the light most favorable to Gorman-Taber on the contention of Fidelity that Count IV was not submissible.

After the completion of construction, Beardsley found it could not meet its obli-

gations on the contract and notified Fidelity of the outstanding obligations, including $16,359.42 owed Gorman-Taber on the subcontract. Fidelity was instructed by Beardsley, however, that this balance should not be paid until a complete release had been received from Coffman on the disputed claim with Gorman-Taber. The supervisory adjuster for Fidelity, H. S. Hudson, was assigned to process the claims against Beardsley on the bond, and on April 11, 1968, he mailed to Gorman-Taber and to the other creditors claim and release forms for the disposition of these claims. Gorman-Taber could not qualify its claim, however, since the dispute with Coffman had not been resolved and the paid receipt required by the release form was not forthcoming. In due course, Fidelity satisfied the claims of all Beardsley creditors except that of Gorman-Taber.

According to William E. Gorman, who testified for Gorman-Taber, after he received the Fidelity communication of April 11, 1968, he telephoned Hudson about the subcontract balance and was told that it would be paid as soon as the Coffman claim was settled and a release delivered. Hudson recalled having spoken on the matter with someone from Gorman-Taber [he had assumed it was the bookkeeper] to whom he had disclosed that Fidelity had set up the account to pay the contract balance as soon as the Coffman claim was discharged.

Sometime later, Hudson received inquiry concerning the account from Dods, attorney for Gorman-Taber, and told him that Beardsley had prohibited Fidelity from making payment until Coffman had given release. Hudson referred Dods to Kirwan, attorney for Fidelity. Dods proposed to Kirwan that Fidelity release the undisputed balance due Gorman-Taber for which his client was willing to indemnify Fidelity, as well as for the amount in dispute, as a condition for its release. A month later, Dods informed Kirwan by telephone, and then confirmed by letter on June 18, 1968, that Fireman's Fund American had tentatively agreed to underwrite an appropriate indemnity bond as to the amount claimed by Coffman. In that letter, Dods expressed concern whether, in view of the lapse of so much time, Fidelity owed any continuing obligation on the suretyship undertaking. Kirwan advised Hudson that Dods had informed him of Fireman's Fund's willingness to indemnify the payment of the disputed balance. On June 20, 1968, however, before any agreement for indemnity could be arranged, Coffman used Gorman-Taber, Fidelity and Beardsley for the balance claimed. The litigation ended the participation by Hudson in the processing of the Gorman-Taber claim. About a month earlier, Smirz, supervisor examiner for Fidelity, had informed Hudson that Fidelity was willing to release the undisputed balance on the contract upon receipt of lien waivers from Gorman-Taber suppliers and a partial waiver from Coffman.

The first communication between the attorneys after onset of litigation was the letter of March 7, 1969, from Dods to Kirwan which reiterated the request that the undisputed portion of the contract balance be released and the willingness of his client to furnish indemnity. Kirwan reiterated that Beardsley had admonished Fidelity against any payment without a full release from Coffman. Dods, nevertheless, repeated his request for payment of the undisputed balance. As matters stood prior to March of 1970, Fidelity had not received any lien waivers from Gorman-Taber suppliers nor any indemnity agreement from Fireman's Fund.

On March 3, 1970, Kirwan wrote the attorney for Fireman's Fund, which represented Gorman-Taber in the Coffman litigation, that "any possible settlement offers on behalf of the Fidelity and Casualty Company of New York, if any have been made, are thereby withdrawn". A copy of this advice went to Dods.

On October 30, 1970, Gorman-Taber reached a compromise and accord with

the public carrier and Coffman, and Coffman dismissed with prejudice. Gorman testified that this settlement was made on reliance on the agreement by Fidelity to make payment when the Coffman dispute was resolved.

The errors Fidelity asserts on this appeal are

1. There was no proof of a valid and enforceable oral contract, independent of the obligation on the surety bond, for the payment of the Gorman-Taber claim in that, as a matter of law

 a. mutual assent to such an oral agreement was not shown

 b. the communications between Fidelity and Gorman-Taber were not an offer for contract

 c. the settlement by Gorman-Taber of the dispute with Coffman was not legal consideration sufficient to support an independent contract with Fidelity to pay the indebtedness of Beardsley

2. Alternatively, assuming an offer for unilateral contract was shown, the offer was withdrawn before acceptance, or was rejected by Gorman-Taber.

The proponent of a claim upon a contract has the burden to shown a valid and enforceable agreement (1) between parties competent to contract (2) upon a proper subject matter (3) for a legal consideration (4) by a mutuality of agreement and (5) with a mutuality of obligation. State ex rel. St. Louis Car Co. v. Hughes, 348 Mo. 125, 152 S.W.2d 193, 198[4–7] (1941); Bengimina v. Allen, 375 S.W.2d 199, 202[1] (Mo.App.1964). Fidelity recites the rule that assent to contract is shown by a distinct intention, common to parties who understand alike concerning the matter and terms of the undertaking. Dobbins v. City Bond & Mortgage Co., 343 Mo. 1001, 124 S.W.2d 1111, 1116[8] (1938); Huttig v.

Brennan, 328 Mo. 471, 41 S.W.2d 1054, 1062[8] (1931). And that such assent cannot be found on the undisclosed assumption or surmise of either party, but rather from an intention manifested by the words and acts of the parties. Shofler v. Jordan, 284 S.W.2d 612, 615[5] (Mo.App.1955).

On these principles, Fidelity contends that, as a matter of law, the evidence lacks intention of assent by Hudson on behalf of Fidelity to a separate and independent oral contract with Gorman to pay the indebtedness owed Gorman-Taber by Beardsley. The essential argument Fidelity makes is that, taken within the context of the entire evidence, the conclusion that Hudson, employed as claims supervisor for Fidelity for twenty-two years, intended to assent by telephone to such an undertaking with someone [as he believed] who was neither an officer nor principal of Gorman-Taber and all without written confirmation, simply is not probative. This argument, however, goes to credibility and does not take into account the rule which requires that in the determination of submissibility the evidence is to be taken most favorably to the submission. McCarthy v. Wulff, 452 S.W.2d 164, 166 (Mo.1970).

The first question which the appeal poses, and which the evidence must answer, is whether Fidelity [through Hudson] made an offer for a contract, that is, a promise, to Gorman-Taber. One pre-eminent authority defines *promise* as "an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future, communicated in such a manner to a promisee that he may justly expect performance and may reasonably rely thereon". 1 Corbin on Contracts, § 13. The definition accepted by the American Law Institute is to the same effect. Restatement of Contracts, § 2. A jury could have found that Hudson by telephone promised payment of the contract balance to Gorman-Taber upon the resolve of its dispute with Coffman and that this promise was confirmed

by attorney Kirwan to attorney Dods by letter of April 25, 1969, which held out payment to Gorman-Taber upon presentation of a full release by Coffman.

We are in accord with the numerous authorities cited by Fidelity that an enforceable contract does not arise unless minds meet and assent in common to the terms of the undertaking. That is only to say, however, that in order to contract there must be a definite offer and an unequivocal acceptance. Bennett v. Tower Grove Bank and Trust Co., 325 S.W.2d 42, 46[3] (Mo.App.1959); Dobbins v. City Bond & Mortgage Company, 343 Mo. 1001, 124 S.W.2d 1111, 1116[8] (1938). In cases of bilateral contract, the offer and acceptance are in the form of mutual promises, and each party is both a promisor and promisee. Middleton v. Holecroft, 270 S.W.2d 90, 92[1–3] (Mo.App.1954). The transaction between Fidelity and Gorman-Taber, however, was not an exchange of promises, but a performance by Gorman-Taber [settlement and release of the Coffman claim] in consideration of the Fidelity promise to pay the contract price. It was an offer for a unilateral contract. Restatement of Contracts, § 12. The validity of assent, therefore, that is of the offer and acceptance, is to be determined by principles of unilateral, not bilateral, contract. A jury could have found that the communication by Hudson to Gorman to pay the contract balance in exchange for a release from Coffman was an assent to contract, certain in terms, which led Gorman reasonably to believe that it was directed for his acceptance. See, 1 Corbin on Contracts, § 11, p. 25. The assent of Gorman-Taber as promisee to the unilateral contract was shown by performance of the act requested: the delivery of the release from Coffman. 1 Williston on Contracts, § 22, Third Edition (Jaeger). There is no contention here that the acceptance [performance] given by Gorman-Taber was in any manner other than required by the offer [assent] made by Fidelity. The contractual element of mutual assent was shown by evidence that the performance given by the promisee was as requested by the promisor.

Fidelity argues, however, that the communications between Hudson and Gorman and the early interchange between attorney Kirwan and attorney Dods were nothing more than preliminary negotiations for the payment of the Gorman-Taber bond claim. Fidelity contends that these communications were merely advisements to Gorman-Taber that the claim could not be processed without a release, and that it was not disputed that Gorman knew that Beardsley had instructed the surety company to make no payments on the Gorman-Taber claim until the Coffman dispute was resolved. Fidelity relies on the rule cited in Dobbins v. City Bond & Mortgage Company, *supra*, 124 S.W.2d l.c. 1115[3] that a proposal to open negotiations for a contract is not binding, though accepted. While negotiations which are expressions of general willingness to enter into a bargain do not constitute a promise [1 Corbin on Contracts, § 11, pp. 25–26]

> [An] act that leads the offeree reasonably to believe that a power to create a contract is conferred upon him . . . creates a power of acceptance and is therefore an offer. . . .
>
> . . . . . .
>
> In order to be legally operative and create a power of acceptance, it is necessary that the offer shall contain all the terms of the contract to be made.

See, also, 1 Williston on Contracts, § 27, Third Edition (Jaeger); Restatement of Contracts, § 32.

The claim by Gorman-Taber that Hudson offered to contract rests on the testimony by Gorman of his conversation with Hudson, the Fidelity supervisory adjuster, after receipt from him of the form which specified, as a precondition to payment the receipts of the suppliers.

Q. Now, did you call anybody at this company?

A. Mr. Hudson.

Q. That's the person who signed this letter?

A. Yes, sir.

Q. When you called him did he appear to be familiar with the problems involving Beardsley and everybody?

A. Yes, sir; very familiar.

Q. Did you have any conversation with him about how much money was due from the Beardsley Company to you on the balance of this job?

A. Yes, sir.

 . . . . . .

Q. Tell us, please, what Mr. Hudson told you in this conversation?

A. *Mr. Hudson said he had sixteen thousand some odd dollars that was due us from the Beardsley Company as soon as the Coffman Industries Agreement was settled.* . . .

Q. How many times did you talk to Mr. Hudson at the insurance company, if you recall?

A. Several times.

Q. *And did you ever reach any agreement with him as to when, if ever, you would get the money?*

 . . . . . .

A. *Yes, as soon as we settled with Coffman they would settle with us.*

Q. *Did you discuss the specific amounts involved?*

A. *Yes, sir.*

Q. Did he ever tell you whether or not the insurance company had received any money from the owner that were payments due on this job?

A. *He said that he had our money, that Beardsley owes us, and he would pay it as soon as Coffman Industries were cleared up.*

Q. *What did you do the, after he had said this to you?*

A. *Well, we immediately set out to clear up the Coffman thing.*

(Emphasis supplied.)

As we have already noted, Hudson conceded that the account at Fidelity was set up to pay off Gorman-Taber as soon as the Coffman claim was settled.

A jury could have found that Hudson meant to offer Gorman the power to contract; that these expressions were not merely preliminary negotiations but a positive offer for a contractual relation, sufficiently definite in terms that the promise and performance of each were reasonably certain. Restatement of Contract, § 32.

■ Fidelity contends that Gorman-Taber was under a pre-existing legal duty to resolve its dispute with Coffman, therefore the purported agreement to pay Gorman-Taber the subcontract balance was without consideration and *nudum pactum*. The consideration sufficient to support a simple contract may consist of a detriment to the promisee or a benefit to the promisor. Either alone is sufficient. Wells v. Hartford Accident and Indemnity Company, 459 S.W.2d 253, 260[10] (Mo.banc 1970). The detriment to the promisee sufficient as consideration for such a contract may consist of the promisee doing something he is not legally bound to do, or from refraining from doing that which he has a right to do. Melton v. ACF Industries, Incorporated, 404 S.W.2d 772, 777[6–9] (Mo.App.1966). Cognately, the promisor for a unilateral contract can be bound only where he has received the consideration bargained for. 17 Am.Jur.2d, Contracts, § 86.

■ Fidelity relies for its principal authority upon Bowman v. C. O. Jones Building Company, 332 Mo. 520, 58 S.W.2d 718 (1933). This case is dissimilar on the facts, however, and does not bear as a precedent. In *Bowman*, the plaintiff con-

tractor claimed the defendant had agreed to compensate him additionally for the installation of slop sinks. The court found that plaintiff was already bound to that performance under the plans and specifications of the contract, therefore any such agreement would have been unsupported by consideration. The rule that performance or promise to perform an existing legal obligation is not valid consideration yields an exception where the existence of the legal duty is the subject of an honest and reasonable dispute. The surrender of a claim honestly in dispute is sufficient consideration to support a new contract. Harlin & Griffin v. Missouri State Highway Commission, 51 S.W.2d 553, 555[5, 6] (Mo. App.1932); 1 Williston on Contracts, § 128, Third Edition (Jaeger). Thus, the payment of money which one does not owe or the performance of an act one is not bound to render is sufficient consideration for a return promise. 1A Corbin on Contracts, § 187. The record discloses a bona fide difference among Gorman-Taber, Coffman and the common carrier as to who bore the legal risk of loss for the damaged equipment. The payment by Gorman-Taber of this disputed claim, rather than insistence upon final adjudication of liability, was a sufficient detriment to it as promisee to constitute consideration for the promise of Fidelity for payment of the subcontract balance.

Fidelity next contends that, even if it be assumed that Hudson extended to Gorman an offer for a unilateral contract, the offer was not unequivocally accepted by Gorman-Taber before the offer terminated by lapse of time or revocation; or, alternatively, that Gorman-Taber rejected the offer which was not thereafter revived.

 The first component of this contention is that the offer for unilateral contract had lapsed before Gorman-Taber accepted by tendering performance. Fidelity cites the rule that when no time is fixed by the offer for an acceptance, the offer expires upon the expiration of a reasonable time. Sharp Bros. Contracting Co. v. Commercial Restoration, Inc., 334 S.W. 2d 248, 252[5] (Mo.App.1960); 17 C.J.S. Contracts § 51. Fidelity argues that, assuming such an offer, it was made by Hudson to Gorman in the telephone conversation of April 1968, and assuming an acceptance by Gorman-Taber, it was manifested by the settlement of the Coffman claim in October of 1970. Fidelity contends that the lapse of two and one-half years between offer and unequivocal acceptance was unreasonable and, as a matter of law, the offer expired. This argument ignores, however, the letter of attorney Kirwan of March 25, 1969, reasonably understood by attorney Dods as a continuance of the Fidelity offer to pay the subcontract balance upon the settlement of the Coffman claim. When we consider this conduct, as well as that the performance requested by Fidelity necessarily involved negotiations among three principals—a procedure undoubtedly protracted by litigation instituted by Coffman barely two months after the offer for contract was made— that the subcontract balance owed by Fidelity was conceded and that time for the performance by Gorman-Taber was not of the essence, it cannot be said that the lapse of two and one-half years between offer and acceptance was *per se* unreasonable.

 Fidelity urges next that even if the offer was not terminated by an unreasonable lapse of time, it was effectively withdrawn by letter of March 3, 1970 from attorney Kirwan to attorney Dods:

In order to obviate any possible misunderstanding as to the posture of the above captioned case, any possible settlement offers on behalf of The Fidelity and Casualty Company of New York, if any have been made, are herewith withdrawn.

This communication, to be sure, attempts the revocation of any offer of contract

made by Fidelity to Gorman-Taber. It is the rule that an offeror may at any time prior to acceptance withdraw his offer unless the offer is supported by consideration. Sokol v. Hill, 310 S.W.2d 19, 20[2] (Mo.App.1958); Gillen v. Bayfield, 329 Mo. 681, 46 S.W.2d 571, 575[3, 4] (1931); 17 Am.Jur.2d, Contracts, § 35. Another rule denies an offeror the right to revoke an offer where the offeree has made substantial performance. 1 Williston on Contracts, § 60A, Third Edition (Jaeger); American Publishing & Engraving Co. v. Walker, 87 Mo.App. 503 (1901). This general rule of law is thus stated in 1 Corbin on Contracts, § 49:

> Where one party makes a promissory offer in such form that it can be accepted by the rendition of the performance that is requested in exchange, without any express return promise or notice of acceptance in words, the offeror is bound by a contract just as soon as the offeree has rendered a substantial part of that requested performance.

The rationale for this rule is given in Restatement of Contracts, § 45, Comment b:

> The main offer includes a subsidiary promise, necessarily implied, that if part of the requested performance is given, the offeror will not revoke his offer, and that if tender is made it will be accepted. Part performance or tender may thus furnish consideration for the subsidiary promises. Moreover, *merely acting in justifiable reliance on an offer may in some cases serve as sufficient reason for making a promise binding.* (Emphasis supplied.)

and in Restatement of Contracts, § 90:

> A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Although the record before us does not show the progression of the Gorman-Taber activity which led to the final settlement of the Coffman dispute, the evidence fairly implies a course of lengthy negotiation among Gorman-Taber, Coffman and the carrier. The record does show, however, that Gorman-Taber relied on the Fidelity promise for payment upon settlement of the Coffman claim, and that in consequence, Gorman-Taber forbore suit against Fidelity and is now barred by the statute of limitations. Fidelity should reasonably have expected that its promise of payment would induce the change of position by Gorman-Taber. These circumstances warrant the application of the rule of promissory estoppel in accordance with the principles of Restatement of Contracts, §§ 45 and 90. Feinberg v. Pfeiffer Company, 322 S.W.2d 163, 167[6–8] (Mo.App. 1959); In re Jamison's Estate, 202 S.W.2d 879, 887[14] (Mo.1947); 1 Williston on Contracts, § 140, Third Edition (Jaeger).

Fidelity makes the final contention that any offer for unilateral contract was rejected by Gorman-Taber before the settlement of the Coffman litigation. It was the evidence that after Hudson offered to contract with Gorman in April of 1968, attorney Dods for Gorman-Taber made five separate written inquiries whether Fidelity would release the undisputed portion of the contract balance and offered an indemnity agreement in exchange for the release of the disputed balance. In his letter of May 7, 1968, to attorney Kirwan, attorney Dods wrote: "I *propose* that this amount that is not in dispute, that is, $7,177.02 be paid immediately to the Gorman-Taber Company." (Emphasis added.) In three later letters, this proposal was repeated and agreement upon its terms was requested. On March 29, 1969, attorney Kirwan responded to the last of these proposals by repeating that payment was contingent upon a release from Coffman. The last direct communication between them was a letter from at-

torney Dods, directed to the atttorneys for Fidelity, Beardsley and the attorney for the Gorman-Taber indemnitor, which sought the release of the undisputed sum owing Gorman-Taber and which inquired whether the principals could meet to "try to work out some solution".

Fidelity cites this evidence as conclusive proof that Gorman-Taber made counter-offers which operated to reject the original offer for contract. Fidelity relies upon the rule that an acceptance which introduces new or variant terms from the offer amounts to a counter-proposition and rejection of the offer, which becomes open again only when renewed by the offeror. Bokern v. Loud, 108 S.W.2d 1049, 1051[1–4] (Mo.App.1937); Lux v. Lewis, 213 S.W.2d 315, 319[2] (Mo.1948); Egger v. Nesbit, 122 Mo. 667, 27 S.W.2d 385, 387[3] (1894). The evidence does, indeed, prove counter-offers by attorney Dods for partial payment of the contract, definite, certain and different in terms than the original offer for contract extended by Fidelity. The response by Fidelity in the March 25, 1969, letter of attorney Kirwan, however, was to reiterate and renew the obligation to pay the contract balance upon receipt of the Coffman release. The subsequent letter by attorney Dods to the principals which suggested a conference for resolution of the dispute contains no definite terms or provisions which could form the basis of an offer, but was merely in the nature of a preliminary step looking to an agreement, and does not affect the reinstated offer which ripened into a contract by the accommodation of the Coffman claim.

We find that the trial court did not err by its order which overruled the motion of Fidelity for a directed verdict on Count IV. Accordingly, we do not reach the issues on the cross-appeal brought by Gorman-Taber as to the judgments entered on Counts II and III.

The judgment is affirmed.

All concur.